# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 16-1372V
### Filed: May 23, 2018

|  |  |
|---|---|
| RICHARD KNAUSS, | Special Processing Unit (SPU); |
| Petitioner, | Decision Awarding Damages; Pain and Suffering; Pneumococcal |
| v. | Conjugate Vaccine; Shoulder Injury |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Related to Vaccine Administration (SIRVA) |
| Respondent. |  |

*Paul R. Brazil, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*Robert Paul Coleman, III, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On October 20, 2016, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that he suffered from a right shoulder injury related to vaccine administration ("SIRVA") as a result of receiving a pneumococcal conjugate vaccine, Prevnar 13, on September 9, 2015. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

On September 5, 2017, the undersigned issued a ruling on entitlement, finding petitioner entitled to compensation for a SIRVA. Petitioner did not request compensation for lost wages or future medical expenses. The parties also agree to an award for petitioner's past out-of-pocket expenses. Thus, the only issue remaining before the undersigned is the amount of damages that petitioner shall be awarded in compensation for pain and suffering pursuant to § 15(a)(4). For the reasons described

---

[1] Because this decision contains a reasoned explanation for the action in this case, the undersigned intends to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

below, the undersigned finds that petitioner is entitled to an award of damages in the amount of **$60,000.00** for pain and suffering.  The undersigned finds that petitioner is entitled to a total award of **$60,170.00.**

## I.      Procedural History

On October 20, 2016, petitioner filed a petition for compensation under the Vaccine Act, alleging that he suffered from a right shoulder SIRVA as a result of receiving a pneumococcal conjugate vaccine on September 9, 2015.  Petition at 1.

On February 16, 2017, respondent filed a status report stating that he was willing to engage in discussions regarding potential settlement.  ECF No. 12.  Thereafter, the parties engaged in settlement discussions and exchanged demands and counteroffers.  See ECF Nos. 14, 16, 18, 20.

On July 19, 2017, petitioner filed a status report stating that the parties have been unable to reach an agreement.  ECF No. 23.  During a status conference, respondent stated that he will not contest entitlement, however the parties stated that they have been unable to reach an agreement with regard to petitioner's pain and suffering.  ECF No. 24.  On September 1, 2017, respondent filed a Rule 4(c) Report conceding that entitlement to compensation is appropriate in this case.  ECF No. 26 at 5.  The undersigned issued a ruling on entitlement on September 5, 2017, finding petitioner entitled to compensation for his SIRVA.  ECF No. 27.

The parties also submitted a joint status report on September 1, 2017, advising the Court that they wished to have a damages hearing.  ECF No. 25.  The parties submitted pre-hearing briefs on November 17, 2017.  ECF No. 31, Petitioner's Brief in Support of Damages ("Pet. Br.") and ECF No. 30, Respondent's Brief on Damages ("Res. Br.").

The undersigned held a damages hearing on December 14, 2017.  Petitioner testified, and presented two witnesses for additional testimony, Juan Kauer and Susan Stevens.  Transcript of Proceedings held on December 14, 2017 ("Tr.").

This case is now ripe for a determination concerning petitioner's damages.

## II.     Fact History

Prior to September 9, 2015, petitioner complained of right shoulder pain with range of motion pain on September 21, 2012.  Ex. 2 at 43-44.[3]  An examination of his shoulder revealed pain with range of motion, however the "pain etiology [was] not clear."  A subsequent x-ray revealed degenerative changes with sclerosis and remodeling of the glenoid, but no fracture or dislocation.  *Id.* at 91. Upon review of the x-ray, petitioner was assessed with degenerative joint disease.  *Id.* at 41, 45.

On September 9, 2015, petitioner, at the time a seventy-two year old right-handed man, received an influenza vaccine in his left upper arm and a pneumococcal conjugate vaccine, Prevnar 13, in his right upper arm.  Ex. 2 at 19.

---

[3] Petitioner also reported episodic minor tremors in his right hand, however stated at the hearing that no doctor has ever told him the tremor was caused by the vaccination.  Tr. at 66.

An undated Vaccine Adverse Event Reporting System ("VAERS") form indicated that petitioner received a flu vaccination in his left shoulder, and a Prevnar 13 vaccination in his right shoulder on September 9, 2015.  The VAERS report also indicated the onset of petitioner's adverse event was on September 9, 2015.  Ex. 1 at 2.

Three months after receiving the vaccination, petitioner reported on December 2, 2015 to Dr. Mark Koshar that he "had flu shot and prevnar shot at pharmacy on 9/9/15 and still has problems with arm…."  Petitioner also stated that since his shot "Pain in area shot [sic]  Radiating down arm and arm feels weaker".  Ex. 2 at 9.  A musculoskeletal exam showed range of motion caused pain, and there was tenderness at the previous injection site.  *Id.* at 10.  An x-ray of petitioner's right shoulder was ordered, which was taken on December 3, 2015.  The x-ray showed no evidence of a fracture, dislocation, or degenerative changes.  *Id.* at 16-17.  Dr. Koshar recommended a physical therapy consultation.  *Id.* at 18.

Petitioner began physical therapy on December 16, 2015 at BT Rehab Services.  Petitioner's initial evaluation states:

> [B]ack in Sept, [petitioner] got the flu shot and pneumonia shot and had a bad reaction.  Has had a dull ache since then also this has improved.  Reports pain the most pain now with swimming when the arm is elevated above the shoulder.  Does laps at the local community pool.  Also reports shoulder pain with raking, yard work, lifting heavy boxes.  Denies difficulty with reaching behind head, but does report difficult reaching behind the back…  Also reports sleep disturbances due to shoulder…  Not taking anything for pain.

Ex. 3 at 9.

The initial evaluation also states that petitioner's pain improves with rest, and that he has difficulty writing due to an unrelated shaking in his wrist.  *Id.*  Petitioner reported that he felt his right arm was getting weaker, and that at that time the pain severity was 0, and at worst reported it was 9.  *Id.* at 9.  An objective evaluation showed petitioner's range of motion in his right arm was limited and painful at certain times.  However, his right arm strength was not reported as decreased.  *Id.* at 10.

Between December 16, 2015 and February 3, 2016, petitioner had 14 physical therapy sessions.  Ex. 3 at 9-31.  The physical therapy notes indicate petitioner was improving.  On January 13, 2016, petitioner stated he felt his shoulder was 75% improved and that he mainly experienced pain with reaching, lifting, and carrying items.  *Id.* at 21.  Petitioner also reported his pain at that time was 1.5.

Petitioner sought medical treatment again on February 4, 2016, complaining of pain in his shoulder that restricted his range of motion.  Ex. 2 at 13.  An evaluation of his shoulder showed petitioner's range of motion was "improved but restricted due to ongoing discomfort".  *Id.* at 14.  Petitioner was advised to keep attending physical therapy.  *Id.* at 15.

Petitioner attended another physical therapy session on February 5, 2016, where he reported his pain at 1/10, and, at that time, "complaints are improving."  Petitioner also stated he was scheduled for "an injection" on February 10th.  Ex. 3 at 29.

On February 10, 2016, petitioner was evaluated by Dr. Dale Federico for shoulder pain.  The physical examination by Dr. Federico showed "no motor or sensory deficit" and that "[Petitioner] has full range of motion of his shoulder, full flexion, full abduction, symmetrical rotation."  Ex. 2 at 23.  The examination also showed that "[petitioner] does have pain with impingement test."  Ex. 2 at 23, Ex. 4 at 9.  Dr. Federico's impression was rotator cuff irritation secondary to injection.  Ex. 2 at 23, Ex. 4 at 9.  On February 10, 2016, Dr. Federico noted that "it was suggested that a cortisone injection would be necessary."  Ex. 2 at 23, Ex. 4 at 9.  However, no injection was administered.

Petitioner saw Dr. Dale Federico on February 16, 2016, to review the results of an MRI.  Ex. 2 at 24, Ex. 4 at 8.  The MRI showed rotator cuff tendinosis, but no evidence of an old rotator cuff tear and mild reactive edema proximal humerus.  Ex. 2 at 24, Ex. 4 at 8.[4]  Dr. Federico stated that petitioner's "best choice at this point would be an exercise program, strengthening and range of motion." Ex. 2 at 24, Ex. 4 at 8.

Petitioner reported his pain at between 1.5 and .5 over 9 physical therapy sessions between January 13, 2016 and February 17, 2016.  Ex. 3 at 21-66.  On February 17, 2016, petitioner attended his last physical therapy session.  *Id.* at 30.  At that time, he stated his shoulder was 94% improved, although he was "still having pain with lifting items such as milk, grocery bags."  *Id.* at 31.  Petitioner also stated that "MD did not recommend an injection."  *Id.* at 31.  Petitioner canceled his final two physical therapy sessions, stating he was doing his home exercises and "feels good so he would like to play it by ear."  *Id.* at 33.

Approximately six months later, on August 29, 2016, petitioner again complained of right arm pain to a second orthopedist, Dr. Kenneth Brislin.  Ex. 5 at 5.  Petitioner reported "improved range of motion; however, he still does not have full range of motion and is unable to do some of his desired activities such as swimming."  *Id.* at 5. Petitioner reported to Dr. Brislin that he continued to have difficulty with overhead activity, difficulty with swimming, especially doing the backstroke, and pain at night.  Dr. Brislin also noted that petitioner "reports that he typically does several mission trips a year for his church. However, he has not been cleared to participate in his trips secondary to his continued shoulder pain."  *Id.* at 5.  Petitioner was diagnosed with "disorder of bursa of shoulder region."  *Id.* at 8.  Dr. Brislin ordered a second MRI, and stated that he "may benefit from a steroid injection."  *Id.*[5]

---

[4] Petitioner contends in his brief that the MRI revealed "mild reactive edema of petitioner's proximal humerus and mild tendonitis and bursitis."  However, there is no evidence in the medical record reflecting petitioner was suffering from, or diagnosed with, bursitis at that time.  *See* Pet. Br. at 3.

[5] Dr. Federico noted that petitioner was seen and evaluated by Lehigh Valley Hospital orthopedic surgeon who "diagnosed him with bursitis" and an MRI was ordered which confirmed bursititis.  However, the records indicate petitioner was not diagnosed with bursitis, but tendinosis, and there is no evidence that an MRI prior to August of 2016 indicated petitioner was suffering from bursitis.

On September 12, 2016, petitioner saw Dr. Brislin a final time for right shoulder pain. Petitioner reported that his range of motion was limited and he "cannot do a backstroke." Ex. 5 at 1. A review of petitioner's range of motion showed "sudden [range of motion] end-point with pain." *Id.* at 3. However, petitioner's shoulder strength was not diminished. *Id.* Dr. Brislin also reviewed petitioner's second MRI, which showed tendinosis about the anterior distal supraspinatus tendon and some bursitis. *Id.* The MRI also showed petitioner had a small partial-thickness rotator cuff tear about the anterior distal supraspinatus tendon that Dr. Brislin felt "may represent just tendinosis." *Id.* at 4. Petitioner was assessed with disorder of the bursa of the shoulder region, and the record includes "Note to Provider: Right Shoulder Bursitis, tendinitis." *Id.* at 4. A steroid injection was provided. *Id.* Dr. Brislin also stated that "I feel that we can treat this shoulder conservatively," and recommended over-the-counter medication and therapy to work on rotator cuff stretching and strengthening. *Id.* Petitioner was referred to physical therapy for bi-weekly sessions over six weeks and scheduled to follow-up with Dr. Brislin on October 10, 2016. *Id.* Petitioner did not follow-up with Dr. Brislin or attend additional physical therapy sessions.

### A. Effect of Petitioner's SIRVA on Volunteer Work

Petitioner has been involved in volunteer work for many years, including traveling for youth mission trips with his church. Petitioner testified that between 1985 and 2014 he participated in "14 or 15" mission trips, including trips to Hawaii, Glasgow, Scotland, Hungary, Argentina, and Costa Rica. Tr. at 25-27.[6] Following his SIRVA, petitioner testified that he had to cancel a mission trip to Argentina in 2015 (*Id.* at 29), and that "I wanted to go to the mission trip to Spain, and the doctors wouldn't release me…." *Id.,* see *also id.* at 13 (Juan Kauer, testifying that petitioner was "really missing the opportunity to go to Spain with us, and he was very, very sad about that"). Petitioner further explained that he had a desire to continue traveling, however "the doctors won't release me. I can't carry the – my suitcases, and if I get sick, I need that medical attention." *Id.* at 31-32. On cross-examination, petitioner added that "Dr. Koshar said he didn't want me to fly internationally in case I, you know, would have any problems overseas. So that's – you know, so that's – he did that, and then I didn't go to Spain." *Id.* at 56. There is no record of Dr. Koshar's advice though, because according to petitioner, it was given "over the phone". *Id.* Petitioner is still able to travel, as he testified that he traveled in 2017 by plane to California for a week to visit family. *Id.* at 45.

In addition to impacting his ability to volunteer abroad, petitioner also testified that his injury has impacted his ability to help people in his local community, stating he had to refocus and he is not able to do the things that he used to do. Tr. at 29.

### B. Current Status

At the time of the hearing, petitioner provided additional testimony and evidence regarding his current condition.

Petitioner stated he still is able to swim, but that he must do stretching every day. Tr. at 32-33. Petitioner also testified that he is unable to perform the butterfly swimming

---

[6] Petitioner's briefing includes descriptions of 14 mission trips, however no affidavit or additional details have been submitted other than the testimony provided by petitioner at the December 14, 2017 hearing.

stroke, however, he is able to do the backstroke again, even though he "wasn't able to do [his] backstroke in [his] swimming" for a period to time.  *Id.* at 63-64.

With regard to pain and the current effect of his SIRVA on his daily life, petitioner testified that he still has some pain, and a shake in his hand now (Tr. at 32)[7], but when asked if he still "has any pain in [his] right shoulder", testified he did not.  *Id.* at 67. Petitioner, who lives alone (*id.* at 40), continues to handle house work and tasks like cutting the lawn and grocery shopping, and has no physical limitations.  *Id.* at 40-42.  In addition, petitioner does not have trouble dressing, can reach behind his back, no longer has any pain, and can sleep on his side for portions of the evening.  *Id.* at 64-67. And while petitioner testified there is nothing he can no longer do with his right arm due to the problems he had after the injection, this is in part because he has learned to compensate.  *Id.* at 65.  For example, petitioner explained that he uses his left hand to carry items such as a cup of coffee because he is still unsteady, or feels weak.  *Id.*

Petitioner testified that he continues to stay active in his church, singing in the choir and is "in missions" (Tr. at 40), and he recently volunteered locally as an advisor at the Easton Children's Home.  *Id.* at 58.

## III.    Contentions of the Parties

Petitioner requests reimbursement of $170.00 for past out of pocket medical expenses.  Respondent states that he does not object to that amount.  Petitioner has not claimed lost wages.  Thus, the only disputed issue before the undersigned is the amount of damages to be awarded for pain and suffering.

Petitioner seeks a pain and suffering award of $150,000.00 for past pain and suffering, and $120,000.00 for future pain and suffering damages.

Petitioner cites one other SIRVA damages award involving a pregnant woman who was diagnosed with rotator cuff tendinosis and subacromial bursitis following a tetanus, diphtheria, acellular pertussis ("Tdap") vaccination.  Pet. Br. at 4.  In that case, the petitioner underwent an ultimately unsuccessful six-week course of physical therapy, and was unable to utilize other treatment such as prescription medications, steroid injections, or arthroscopic surgery because of her pregnancy.  Consequently, petitioner struggled to care for her newborn child.  *Id.* at 4-5.  Petitioner emphasizes that, due to his shoulder injury, he was forced to cancel a mission trip to Argentina in 2015 and Spain in 2017.  *Id.* at 6.  Further, because petitioner will not travel on another mission, he "has been deprived of the opportunity to end his work on his own terms." *Id.* at 7.

Respondent proposes an award of $30,000.00 in pain and suffering.  Res. Br. at 1.  Respondent asserts that the medical records reveal petitioner's right shoulder pain was relatively mild, and could have been due in part to a preexisting degenerative joint disease.  *Id.* at 5.  Respondent also contends that petitioner did not seek treatment until almost three months after the vaccination, and that his symptoms were nearly completely resolved by February 17, 2016, less than six months after his Prevnar 13

---

[7] Petitioner's hand tremor is unrelated to his SIRVA injury.  *See* Tr. at 66 (petitioner testifying that a doctor has not stated the tremor was caused by the vaccination); Ex. 3 at 9 (petitioner's initial physical therapy evaluation states shaking in his wrist is unrelated to his right arm pain).

vaccination.  *Id.* at 6.  While petitioner did seek additional treatment in August of 2016, respondent highlights petitioner's ability to deal with his injury without treatment for long periods of time.

## IV.    Discussion

There is no formula for assigning a monetary value to a person's pain and suffering.  *See I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125 at *9 (Fed. Cl. Spec. Mstr. May 14, 2013), *originally issued* Apr. 19, 2013 ("*I.D.*") ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V, 1996 WL 300594 at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").  In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

There are three published decisions involving damages awards for a SIRVA where the damages were not based on informal agreements between the parties.  In the first, *Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017), the undersigned awarded $85,000.00 for pain and suffering to a petitioner who suffered a SIRVA after receiving a Tdap vaccine in March 2015.  *Id.*, at *1.

The petitioner in *Desrosiers* is distinguishable.  In that case, petitioner was hampered by the fact that she was six months pregnant at the time of the vaccination.  She was unable to avail herself of treatments which could have improved her condition such as pain medication, steroid injections, and surgery.  Additionally, the petitioner in that case was attempting to work while caring for her one-year-old child and, after giving birth, her infant.  The *Desrosiers* petitioner also suffered a relapse after giving birth, and her shoulder injury affected her ability to care for her newborn baby.  *Id.* at *3-4.  The petitioner in *Desrosiers* experienced the most severe symptoms for seven months and the duration of her symptoms was at least two and a half years.  *Id.*  The decision in *Desrosiers* expressly stated that the amount of the award was calculated in part to reflect petitioner's particular circumstances and limitations in treatment options imposed by her pregnancy.  *Id.* at *5.

In another decision awarding damages not based on an informal agreement between the parties related to a SIRVA, *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 122192 (Fed. Cl. Spec. Mstr. Feb. 1, 2018), the undersigned awarded $85,000.00 for past pain and suffering, $10,000.00 for future pain and suffering for the year following the decision, and $862.15 for past unreimbursable medical expenses, for a total of $95,763.14.[8]  The petitioner in *Dhanoa* suffered a SIRVA after receiving a flu vaccine in August 2014.  In *Dhanoa*, the petitioner's initial pain level was 5 out of 10, but three months post-vaccination had risen to "nine and

---

[8] The award for future pain and suffering was reduced to a present value of $9,900.99.

one-half or ten and one-half." *Dhanoa*, 2018 WL 122192, at \*3.  In *Dhanoa*, the petitioner sought treatment off and on for a period of over three years.  *Id.* at \*4-5. Petitioner received two cortisone injections and attended physical therapy sessions off and on over a period of approximately eight months.  *Id.* at \*4-5.  As recently as November 2017, the petitioner in *Dhanoa* required medical treatment, a cortisone injection, for her SIRVA.  *Id.* at \*5.

In a third decision, *Marino v. Sec'y of Health & Human Servs.*, No. 16-622, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 24, 2018), the petitioner was awarded $75,088.00 comprised of $75,000.00 for actual pain and suffering and emotional distress, and $88.88 for past unreimbursable medical expenses.  *Id.* at \*1.  The petitioner in *Marino* suffered a SIRVA after receiving a flu vaccination in September 2014, and her pain and suffering lasted until at least March 2, 2017.  *Id.* at \*8.  In addition, in *Marino*, petitioner's most intense pain and limiting symptoms lasted for approximately seven months, and at two orthopedic assessments in April 2015, petitioner reported pain levels of six out of ten and five out of ten.  *Id.*  Petitioner's treatment consisted of a cortisone injection, an MRI, and a home exercise program.  *Id.* at \*7-8.  In *Marino*, the undersigned also found that petitioner's injury affected many aspects of her life and caused suffering and distress.  Petitioner's injury negatively impacted her ability to perform her job, which required that she move patients and assist colleagues in moving patients in her employment as a nurse practitioner.  *Id.* at \*8-9. Petitioner's injury also resulted in the loss of a longstanding and enjoyable physical activity and outlet for stress relief.  *Id.*

### A. Petitioner's Pain and Suffering

Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722 at \*22-23 (Fed. Cl. Spec. Mstr. Mar, 18, 1996).  Contemporaneous medical records generally provide the most reliable supporting documentation of a medical condition and the effect it has on an individual's daily life.  *See Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections"), *citing United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948); *see also Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528-29 (Fed. Cir. 1993) (noting that medical records are generally contemporaneous to the medical events recorded and are generally trustworthy records).

After a review of the entire record, as well as the parties' briefing, the undersigned finds that $60,000.00 represents a fair and appropriate amount of compensation for petitioner's past pain and suffering.  This amount accounts for the fact that petitioner reported pain and restricted range of motion following his vaccination on September 9, 2015 (Ex. 2 at 9) until at least February 17, 2016, when he reported he was 94% improved and his pain level was 1.5.  Ex. 3 at 31.  At petitioner's most recent evaluation, conducted by Dr. Brislin on September 12, 2016, petitioner reported he continued to have some pain and limited range of motion approximately one year after his vaccination.

The amount also accounts for petitioner's diagnostic testing, evaluations, and treatments.  These include two MRIs, a course of physical therapy sessions between December 16, 2015 and February 17, 2016 (Ex. 3 at 9-31), and one cortisone injection.  Ex. 5 at 4.  Petitioner's first MRI in 2016 showed mild reactive edema and rotator cuff tendinosis, and he was diagnosed with rotator cuff irritation secondary to injection.  Ex. 2 at 23, Ex. 4 at 9.  Petitioner received another MRI in September of 2016 that showed significant tendinitis and some bursitis. Ex. 5 at 8.

The impact of petitioner's injury on his daily life is also taken into account.  Due to petitioner's SIRVA, he was unable to exercise, perform yard work, sleep comfortably, and perform overhead activities in the capacity he could prior to the September 9, 2016 vaccination.  Perhaps most distressing for petitioner was his inability to participate in international volunteer work.  Petitioner testified that he was forced to cancel one international mission trip, and was not able to attend a second.[9]

The undersigned notes that this award is less than the amount requested by petitioner.  Several factors weigh against petitioner's request, including the severity of petitioner's injury, the duration of his suffering, and petitioner's delay in seeking treatment.  Petitioner first sought treatment for his arm pain on December 2, 2015, almost three months after his vaccination.  Petitioner's pain was also not as long-lasting or severe as the other SIRVA cases discussed *supra*.  Petitioner did not report significant pain during his last nine physical therapy sessions (stating his pain was between 1.5 and .5 between January 13, 2016 and February 17, 2016), and that he was 94% improved as of February 17, 2016.  Ex. 3 at 21-66.  The physical examination performed by Dr. Federico on February 16, 2016, also showed that petitioner had full range of motion of his shoulder.  Ex. 2 at 23.

Further, petitioner went extended periods of time without any treatment.  After he canceled his final physical therapy sessions because he "feels good so he would like to play it by ear", it was not until August 29, 2016 that he sought treatment again.  Ex. 3 at 33, Ex. 5 at 5.  The fact that petitioner did not seek medical care or treatment for his shoulder injury for approximately three months after receiving the vaccination, and for a six-month period between February and August of 2016, indicates that his symptoms did not interfere with his ability to participate in activities of daily life to a degree that was unmanageable.  In addition, petitioner chose not to partake in the physical therapy after his September 12, 2016 appointment despite Dr. Brislin's referral.  Ex. 5 at 4. Lastly, petitioner did not attend a follow-up appointment with Dr. Brislin on October 10, 2016, suggesting that petitioner no longer needed medical treatment.

The impact on petitioner's daily life was also not as extensive as other cases discussed *supra*.  The record shows that petitioner was still able to swim while undergoing treatment, and able to continue physical tasks such as performing yard work, grocery shopping, and volunteering locally.

---

[9] Petitioner testified that he has been unable to travel for additional missions because the doctors "wouldn't release me", however, the medical records do not document that petitioner received advice to limit his future travel due to his shoulder injury.

The undersigned also finds that the evidence does not support petitioner's claim for future pain and suffering.  At the time of the hearing, petitioner testified that he has no pain in his shoulder, does not have trouble dressing, can reach behind his back, can sleep on his side for portions of the evening, and ultimately regained the ability to do the backstroke.  Tr. at 64-67.  Further, petitioner's medical records indicate that he is no longer seeking treatment for his right shoulder pain, he testified that his last physical therapy session was on February 17, 2016, and his last appointment with a doctor was with Dr. Brislin in 2016.  *Id.* at 51, 59.

There is also little evidence that petitioner's SIRVA negatively impacts his future ability to volunteer.  Petitioner testified that "the doctors won't release me" for international travel, and that Dr. Koshar indicated he did not want petitioner to fly internationally.  Tr. at 29, 56.  However, petitioner has continued to volunteer domestically, and testified that he continues to be active in his church "in missions".  *Id.* at 40, 58.  Petitioner is also able to travel, testifying that he traveled by plane to California in 2017 for a week to visit family.  *Id.* at 45.

## V.    Conclusion

**For all of the reasons discussed above, and based on consideration of the record as a whole, the undersigned finds that $60,000.00 represents a fair and appropriate amount of compensation for petitioner's pain and suffering.  In addition, the undersigned finds that petitioner is entitled to compensation for $170.00 in past unreimbursable medical expenses.**

Based on the record as a whole and arguments of the parties, **the undersigned awards petitioner a lump sum payment of $60,170.00 in the form of a check payable to petitioner, Richard Knauss.**  This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[10]

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Chief Special Master

---

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.